IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OMICRON SAFETY AND RISK TECHNOLOGIES, INC., | ) ) ) |
| Plaintiff, | ) |
| v. | ) No. 14 C 2761 |
| UCHICAGO ARGONNE, LLC, | ) ) ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER

UChicago Argonne, LLC ("UChicago Argonne") has moved to dismiss this breach of contract action on the ground that Omicron Safety and Risk Technologies, Inc.'s ("Omicron") claims are barred by anti-assignment and waiver provisions in the underlying contracts. I deny UChicago Argonne's motion to dismiss for the reasons stated below.

I.

At the motion to dismiss stage, I must accept Omicron's factual allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

UChicago Argonne operates the Argonne National Laboratory ("ANL") in Lemont, Illinois pursuant to a contract with the U.S. Department of Energy. Dkt. No. 1 ("Compl.") at ¶ 2. The ANL campus includes an Intense Pulsed Neutron Source ("IPNS") facility that was used to conduct neutron scattering research

1

until Congress defunded its operations in January 2008. *Id*. at ¶¶ 11-15. The IPNS facility is presently in a "safe shutdown mode." *Id*. at ¶ 15.

After operations ceased at the IPNS facility, UChicago Argonne issued a Request for Proposals ("RFP") to perform "characterization" work at the site. *Id*. at ¶ 7. In simple terms, characterization work involves ascertaining whether hazardous and radiological materials are present. *Id*. at ¶ 11. This information would inform UChicago Argonne's decision about how to decommission and demolish the IPNS facility. *Id*.

In August 2011, UChicago Argonne awarded a $2.16 million characterization services contract ("the Contract") to Omicron. *Id*. at ¶ 16. While performing the Contract, Omicron encountered "unforeseen field conditions" that UChicago Argonne had not disclosed when soliciting bids. *Id*. at ¶ 8. In particular, Omicron complains that it incurred cost overruns because the drilling/coring work was more difficult, costly, and time intensive than UChicago Argonne had represented in the RFP and other bidding documents. *Id*. at ¶¶ 7, 22-24.[1] Had UChicago Argonne disclosed the true nature of the required work at the bidding stage, Omicron says it would have "dramatically

---

[1] Omicron also faults UChicago Argonne for cost overrun factors unrelated to field conditions. *See* Compl. at ¶¶ 7, 9.

increased its cost estimate and corresponding bid price." *Id*. at ¶ 8.

In January 2012, five months before its final characterization report was due, Omicron sold all of its assets to Nuclear Safety Associates, Inc. ("NSA"). *Id*. at ¶ 16. In order to assign its interest in the Contract to NSA, Omicron needed to obtain UChicago Argonne's consent. *See* Dkt. No. 20-1 at Ex. 2, ¶ 34 ("Anti-Assignment Provision"). UChicago Argonne consented to the proposed assignment in a "Novation Agreement" signed at the same time as NSA's purchase of Omicron's assets. *Id*. at Ex. 1. In signing the Novation Agreement, Omicron waived the right to bring any claims against UChicago Argonne in connection with the Contract. *Id*. at ¶ (b)(1) ("Waiver Provision"). NSA, in turn, agreed to perform the Contract in accordance with its original terms, including the Anti-Assignment Provision. *Id*.

NSA subsequently assigned its rights under the Contract back to Omicron without UChicago Argonne's consent. Compl. at ¶ 16. Omicron has now filed suit against UChicago Argonne to recover almost $1.2 million in cost overruns under four separate breach of contract theories.

UChicago Argonne has moved to dismiss Omicron's complaint on the ground that it fails to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6).

II.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Omicron's claims are facially implausible if, as UChicago Argonne contends, they are barred by the Anti-Assignment and/or Waiver Provision. The meaning of these provisions "'must be determined from the words or language used'" without "'plac[ing] a construction on the contract which is contrary to the plain and obvious meaning of the language.'" *INEOS Polymers, Inc. v. BASF Catalysts*, 553 F.3d 491, 498 (7th Cir. 2009) (quoting *McWane, Inc. v. Crow Chicago Indus., Inc.*, 224 F.3d 582, 584 (7th Cir. 2000)). If the provisions are unambiguous, I may determine their meaning as a matter of law at the motion to dismiss stage. *Id*.

The Contract provides that it shall be construed in accordance with the federal common law of contracts, to the extent such law exists on a particular interpretive question, or Illinois law. *See* Dkt. No. 20-1 at Ex. 2, ¶ 20.

A.

The Anti-Assignment Provision states: "Neither this contract nor any interest therein nor claim thereunder shall be assigned or transferred by the contractor except as expressly authorized in writing by the Laboratory." Dkt. No. 20-1 at Ex. 2, ¶ 34.

It is undisputed that UChicago Argonne did not consent in writing to NSA's assignment of its rights under the Contract back to Omicron after signing the Novation Agreement. Therefore, according to UChicago Argonne, the Anti-Assignment Provision requires dismissal of Omicron's breach of contract claims.

Omicron counters that under the Restatement (Second) of Contracts (1981), an anti-assignment provision does not prohibit the assignment of a contractual right to sue for money damages:

> A contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, (a) does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation[.]

*Id*. at § 322(2); *see also Bank of Am., N.A. v. Moglia*, 330 F.3d 942, 948 (7th Cir. 2003) (noting that Illinois follows the "modern view" expressed in Restatement (Second) of Contracts § 322(2)). The logic behind this rule is that it should make no difference to UChicago Argonne whether NSA or an assignee sues

5

to recover money allegedly owed under a fully performed contract. *Id.* at § 317 cmt. d ("When the obligor's duty is to pay money, a change in the person to whom the payment is to be made is not ordinarily material.").

The Illinois Supreme Court adopted a similar rule almost a century ago, long before the Restatement was promulgated:

> After [a] contract [with an anti-assignment provision] has been fully executed and nothing remains to be done except to pay the money, a different rule applies. The element of the personal character, credit, and substance of the party with whom the contract is made is no longer material, because the contract has been completed and all that remains to be done is to pay the amount due. The claim becomes a chose in action, which is assignable and enforceable[.]

*Ginsburg v. Bull Dog Auto Fire Ins. Ass'n of Chicago*, 160 N.E. 145, 146 (Ill. 1928) (applying rule to permit assignment of insurance policy despite anti-assignment provision); *see also Lain v. Metro. Life Ins. Co.*, 58 N.E.2d 587 (Ill. 1945) (same); *Morticians' Acceptance Co. v. Metro. Life Ins. Co.*, 58 N.E.2d 854 (Ill. 1945) (same); *Ill. Tool Works, Inc. v. Commerce and Industry Ins. Co.*, 962 N.E. 2d 1042, 1053-56 (Ill. App. Ct. 2011) (same). Illinois courts have also applied the rule quoted above to permit the assignment of rights under an employment contract and a municipal services contract despite the presence of anti-assignment clauses. *See State St. Furniture Co. v. Armour & Co.*, 177 N.E. 702 (Ill. 1931) (employment contract);

6

*Village of Westville v. Loitz Bros. Constr. Co., Inc.*, 519 N.E.2d 37 (Ill. App. Ct. 1988) (municipal contract).

The Seventh Circuit has recognized the continuing vitality of the Illinois rule that anti-assignment clauses do not block the assignment of a right to sue for breach of contract.

> Illinois distinguishes between rights and duties under an agreement and rights to damages following breach. Thus if a contract between Plácido Domingo and the Lyric Opera contains an anti-assignment clause, and Domingo decides that he is too pooped to participate, he can't send Neil Shicoff in his stead even if the opera is Offenbach's *Tales of Hoffmann.* But if Domingo sings, and the opera does not pay, he can transfer to Shicoff (or anyone else) the right to collect.

*Mut. Assignment and Indemnification Co. v. Lind-Waldock & Co., LLC*, 364 F.3d 858 (7th Cir. 2004).

UChicago Argonne attempts to counter these authorities with cases in which Illinois courts have blocked a party's attempted assignment of his or her right to annuity payments under a personal injury or wrongful death settlement.[2] There are compelling reasons to enforce anti-assignment provisions in the context of structured settlement agreements that are not present here. *See* 26 U.S.C. § 130(c)(2)(B) (affording favorable tax treatment to structured settlements that include anti-assignment

---

[2] *See In re Foreman*, 850 N.E.2d 387 (Ill. App. Ct. 2006); *In re Shaffer*, 746 N.E.2d 285 (Ill. App. Ct. 2001); *In re Nitz*, 739 N.E.2d 93 (Ill. App. Ct. 2000); *Green v. Safeco Life Ins. So.*, 727 N.E.2d 393 (Ill. App. Ct. 2000); *Henderson v. Roadway Express*, 720 N.E.2d 1108 (Ill. App. Ct. 1999).

provision); 215 ILCS § 153/25(a) (requiring judicial approval before structured settlement payments can be assigned to a third party). In other words, Illinois courts have enforced anti-assignment provisions in structured settlement agreements against a backdrop of federal and state laws designed to promote that result. *See Nitz*, 739 N.E. 2d at 97 (noting Illinois legislature's concern that structured settlement beneficiaries "were accepting offers of ready, but deeply discounted, cash from companies in exchange for their settlement annuity payments and then ending up penniless and without resources in the future"), 101 (expressing concern that favorable tax treatment could disappear if structured settlement payments were assignable). Here, in contrast, there is no thumb on the scale favoring strict enforcement of the Anti-Assignment Provision to preserve favorable tax treatment or protect one of the original contracting parties from unscrupulous assignees.

UChicago Argonne's final argument is that the Restatement's default rule does not apply in this case because the Anti-Assignment Provision purports to bar the assignment of any "claim[s]" arising under the Contract. *See* Restatement (Second) of Contracts § 322(2) (noting that rule applies except when "a different intention is manifested"). Illinois courts, however, have allowed assignees to sue for breach of contract even when the underlying contract purported to bar the assignment of any

claims.  *See State St. Furniture*, 177 N.E. at 703 (assignee allowed to sue even though underlying employment agreement barred the assignment of "any right to or *claim* for wages or salary" (emphasis added)).

In sum, the Anti-Assignment Provision does not prohibit Omicron's breach of contract claims against UChicago Argonne.

B.

UChicago Argonne also seeks dismissal of Omicron's claims based on the Waiver Provision.

In signing the Novation Agreement, Omicron "waive[d] any claims and rights against Argonne that it now has or may have in the future in connection with the [assigned] contracts." Dkt. No. 20-1 at Ex. 1.

UChicago Argonne tacitly concedes that the Waiver Provision was standard language lifted word-for-word from the Federal Acquisition Regulations concerning novation agreements.  *See* 48 C.F.R. § 42.1204(i) (setting forth model novation agreement that "[t]he responsible contracting offer shall use...when [as here] the transferor and transferee are corporations and all the transferor's assets are transferred").

The Waiver Provision must be interpreted to effectuate the intent of the regulation from which it derives rather than the intent of the parties.  *See Raytheon Co. v. U.S.*, 105 Fed. Cl. 236, 255 (Fed. Cl. 2012), *aff'd*, 747 F.3d 1341 (Fed. Cir. 2014).

"The waiver [provision in the model novation agreement for government contracts] is intended to protect the government from multiple claims that might arise 'in connection with' the specific contracts that are transferred from the seller to the buyer." *Id*. (quoting 48 C.F.R. § 42.1204(i)(b)(1)).

UChicago Argonne argues that the Waiver Provision should be interpreted to prohibit Omicron's claims because NSA may "one day bring a *separate* Contract claim against UChicago Argonne that (inadvertently of intentionally) seeks the *same* or overlapping costs/damages included in the claims in this action." Dkt. No. 28 at 12. This argument is entirely speculative and assumes (without any factual support) that NSA assigned some, but not all, of its potential breach of contract claims to Omicron.[3]

I decline to dismiss Omicron's breach of contract claims based on UChicago Argonne's unsubstantiated concern that NSA may assert similar claims in violation of the Waiver Provision's intended purpose.

III.

UChicago Argonne's motion to dismiss is DENIED for the reasons stated above.

---

[3] In its opposition brief, Omicron represents that NSA assigned all of its claims against UChicago Argonne to Omicron. *See* Dkt. No. 24 at 11.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 6, 2015